1

2

3

4

5          **UNITED STATES DISTRICT COURT**

6          **EASTERN DISTRICT OF CALIFORNIA**

7

8    **ESPERANZA BOOKE, individually and**              **CASE NO. 1:13-CV-586 AWI SAB**
     **as personal representative of the Estate of**
9    **Charles Salinas,**
                                                        **ORDER ON DEFENDANTS' MOTION**
10                 **Plaintiff**                        **FOR SUMMARY JUDGMENT**

11            **v.**
                                                        (Doc. No. 52)
12   **COUNTY OF FRESNO, et al.,**

13                 **Defendants**

14

15          This case stems from a fatal confrontation between decedent Charles Salinas ("Salinas")

16   and members of the City of Sanger Police Department ("SPD") -- Defendants Jason Boust

17   ("Boust"), Preston Little ("Little"), Robert Pulkownik ("Pulkownik"), and Angela Yambupah

18   ("Yambupah").  Plaintiff alleges claims under 42 U.S.C. § 1983 and California state law against

19   these officers, as well as against SPD Chief Rodriguez ("Chief Rodriguez") and the City of Sanger

20   ("the City").  Defendants now move for summary judgment on all claims alleged against them.

21   For the reasons that follow, Defendants' motion will be granted in part and denied in part.

22

23                      **SUMMARY JUDGMENT FRAMEWORK**

24          Summary judgment is proper when it is demonstrated that there exists no genuine issue as

25   to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

26   Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

27   Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

28   the initial burden of informing the court of the basis for its motion and of identifying the portions

of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty

Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d

509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must

affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

issue at trial, the movant may prevail by presenting evidence that negates an essential element of

the non-moving party's claim or by merely pointing out that there is an absence of evidence to

support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

fails to carry its burden of production, then "the non-moving party has no obligation to produce

anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be

drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

(9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

1    inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

2    899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly

3    D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

4    air, and it is the opposing party's obligation to produce a factual predicate from which the

5    inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

6    2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

7    issue of material fact does not spring into being simply because a litigant claims that one exists or

8    promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

9    15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

10   2002).  The parties have the obligation to particularly identify material facts, and the court is not

11   required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo

12   Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be

13   defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson,

14   477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the

15   nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

16   moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

17

18                                **FACTUAL BACKGROUND**[1]

19          At about 3:00 p.m. on June 15, 2012, Salinas called 911 because he was emotionally

20   distraught and suicidal.  PUMF 1.  The 911 operator relayed information to City police units via

21   radio throughout the conversation with Salinas.  See Clark Report at p.5; Allen Dec. Ex. A; PUMF

22   2.  The following information was relayed from the 911 call to the City police:  (1) there was a

23   suicidal male named Charles Salinas at 1120 N St. with a 9mm handgun and two knives; (2)

24   Salinas had been drinking and refused to put away his weapons; (3) Salinas "will not hurt anyone

25   he just wants the units to shoot him"; (4) Salinas "will jump [towards] the officer just to provoke

26   ─────────────────────

27   [1] "DUMF" refers to Defendants' Undisputed Material Fact; "PUMF" refers to Plaintiff's Undisputed Material Fact.
     The parties have submitted nearly 270 combined "undisputed" facts.  Some of these facts are disputed and some are
     objected to.  The Court will not utilize all of the 270 facts or address each dispute or objection.  Were evidence to

28   which an objection has been made is utilized in this order, the objection is deemed overruled.  Further, where a
     conflict in the evidence exists, Plaintiff version of events will be credited.  See Narayan, 616 F.3d at 899.

                                           3

1   them to shoot him," but again "he will not hurt anyone he just wants the units to shoot him."  See

2   DUMF 1, 2, 3, 4; PUMF 2, 3.

3          SPD officers Boust, Little, and Yambupah initially responded to the call.  See DUMF 6.

4   Pulkownik also responded, but arrived later.  See DUMF's 30-32.  Boust (as the ranking officer)

5   gave orders to Little and Yambupah to block off nearby traffic, form a perimeter, deploy their AR-

6   15 patrol rifles, and radio in if anyone saw Salinas.  See DUMF's 9, 10, 11; PUMF's 5, 6.  A

7   perimeter was established in part because the dispatch call concerned a suspect with a gun and

8   knives, Salinas's exact location was unknown, and it was daylight near a major street.  See PUMF

9   12.  When Pulkownik arrived, he retrieved his less lethal shotgun.  See DUMF 33, PUMF 7.

10         Yambupah was the first officer to see Salinas.  See PUMF 8.  Salinas was walking fast and

11  leaning towards Yambupah.  See DUMF 16.  Eventually, Yambupah lifted her rifle towards

12  Salinas, and Salinas ran away.  See DUMF's 19, 20.  Yambupah lost sight of Salinas as he was

13  entering a parking lot from an alley.  PUMF 9.  Yambupah followed after Salinas.  See DUMF 23.

14  Thinking that Salinas might be hiding in an auto shop in the area, she approached the shop and

15  spoke to two people inside.  See DUMF's 24, 25; PUMF 10.  Yambupah then heard Pulkownik's

16  voice shouting from the other end of the parking lot.  See DUMF 26; PUMF 10.  Yambupah saw

17  Pulkownik standing at the front entrance of the parking lot.  See DUMF 27.  Yambupah took

18  cover behind a building and requested backup.  See DUMF 29.

19         Pulkownik had located Salinas lying in bushes in an elevated planter in the parking lot.

20  See DUMF 42; PUMF 12; Plaintiff's Ex. LL.  Pulkownik yelled at Salinas, "Show me your

21  hands!"  See PUMF 27; DUMF 13.  Pulkownik had his handgun drawn, but then holstered the

22  handgun and engaged the bean-bag shotgun.  See PUMF's 13, 14.  Pulkownik placed himself

23  about 5 to 10 feet directly in front of the planter.  See PUMF 15.  Salinas was unresponsive

24  initially, but he eventually sat up in a sitting position.  See DUMF's 45, 47.  Pulkownik could see

25  Salinas's head, a little bit above the shoulder line, Salinas's blue jeans including the shins and

26  groin area, and could see shadows and movement from Salinas's arms.  See Pulkownik Depo.

27  28:21-29:13.  Pulkownik continued to order Salinas to show his hands.  See id. at 29:24-30:1.

28  Salinas "flipped off" Pulkownik with both hands.  See McCahill Depo. 48:16-25, 50:1-7.

4

Salinas's right hand then reached to a nearby bush.  See id. at 50:1-7; Pulkownik Depo. 29:24-30:6.  Salinas was saying things to Pulkownik, and Pulkownik eventually realized that Salinas was saying that he was a veteran and was giving his name, rank, and serial number.  See id. at 30:12-22.  Pulkownik began to talk to Salinas about the military/the Marines, and addressed Salinas as a Marine.  See id. at 31:16-32:4.

At some point while Pulkownik was interacting with Salinas, backup arrived.  DUMF 51.  Fresno County Sheriff's Deputy McCahill (who had heard the dispatch broadcast) arrived at the planter, followed by Boust and Yambupah.  See DUMF 52; PUMF 16.  McCahill stood to the right of Pulkownik, Boust stood to the right of McCahill, and Yambupah stood next Boust.  DUMF 53.  Little then joined the firing line and stood to the left of Pulkownik.  PUMF 25.  Other officers besides Pulkownik ordered Salinas to show them his hands.  See PUMF 23.  With the inclusion of Little, there was one beanbag shotgun (Pulkownik), 1 handgun (McCahill), and 3 AR-15 patrol rifles (Boust, Little, and Yambupah) pointing at Salinas.  See PUMF 26.  However, Boust, Little, and Yambupah also had less lethal weapons available, including batons and tasers.  PUMF 59.  None of the officers assumed a position of cover, although McCahill's patrol car and other vehicles were in close proximity to the planter.  See PUMF's 61, 62, 63.

After speaking with Pulkownik for what may have been around 30 seconds, Salinas stood up, see Pulkownik Depo. 34:12-35:7, and took a couple of steps towards the officers, but remained in the planter near the edge.  See McCahill Depo. 52:16-19 & Ex. 6.  Salinas remained in a dirt portion of the planter and was no longer in the bushes, and McCahill had an unobstructed view of Salinas's hands and waist area.  See id. at 73:25-74:14.  Before he stood up, Salinas showed the palms of both his hands.  See id. at 50:16-21.  McCahill and other officers had ordered Salinas several times to come out of the planter and lay on the ground.  See id. at 49:15-22; DUMF 44.

Pulkownik continued to converse with Salinas after Salinas stood up.  See DUMF 63.  Salinas said that nobody cared about him, he was 40 years old, and he was just worthless, to which Pulkownik said he was a veteran and that a lot of people cared about him.  See DUMF 64; PUMF's 32, 33.  A K-9 unit was en route to the scene, and the goal was to draw the situation out until the K-9 unit arrived; Pulkownik commented to the other officers under his breath to "wait for

the dog." DUMF 70. Salinas pointed to each officer and said, "I don't want you to shoot me," but then pointed to McCahill and said, "I want you to shoot me." See DUMF's 71, 72. McCahill responded by saying, "No, we don't want this to happen like this," "I don't want to shoot you," and "Just give up, do what we say, get through this." DUMF 73. The City officers told Salinas to give up and get on the ground or lay on the ground. See McCahill Stmt. 20:17-22.

Pulkownik and Little noticed that Salinas took a "bladed" position, meaning one foot was forward and another foot was back. See DUMF 74. Pulkownik testified that Salinas assumed this position in "may be 30 seconds or less" from the time Salinas stood up. See DUMF 74; Pulkownik Depo. 54:12-20. All officers noticed a bulge on one side underneath Salinas's shirt, and McCahill thought that the bulge might be a gun holster. See DUMF's 75,76. McCahill did not believe that Salinas was an immediate threat because there was no gun in Salinas's hands. See McCahill Stmt. 10:15-20.

Salinas then "moved" towards the officers.[2] See Plaintiff's Ex. LL; see also DUMF 78; PUMF 45. Salinas was no more than 3 to 7 yards from the officers. DUMF 83. Pulkownik yelled "less lethal" as he fired the beanbag shotgun. See Pulkownik Depo. 57:24-58:9. Around the same time, Boust, Little, and Yambupah fired their AR-15 rifles. See DUMF 85; PUMF 47. It appears that Pulkownik fired first, and then the three City officers fired together in extremely close succession, nearly simultaneously. See Plaintiff's Ex. LL; PUMF 47. Boust and Yambupah testified that they fired after believing that the beanbag round was ineffective. See DUMF 86; Boust Depo. 48:15-50:12, Yambupah Depo. 40:24-41:24. Boust, Little, and Yambupah fired 22 rounds from their AR-15 patrol rifles (12 shots from Yambupah, 9 shots from Little, and 3 shots from Boust), and continued to fire after Salinas collapsed on the ground. See PUMF's 47, 48, 50, 51, 52. Salinas was shot in the head while he was lying on the ground. See McCahill Depo. 75:14-76:2. Pulkownik fired 2 beanbag rounds. See PUMF 53. McCahill did not discharge his firearm, because he heard "beanbag" yelled three times and he wanted to see if the beanbag round would take down Salinas. See McCahill Depo. 62:18-25.

---

[2] There is a dispute regarding the nature of Salinas's movements, which is explained in greater detail below. For purposes of this section, the Court uses the term "moved" as shorthand to explain that Salinas was in motion and not standing still.

Salinas was pronounced dead at the scene, with cause of death later determined to be perforation from gunshots to the heart, brain, left lung, and aorta. <u>See</u> DUMF 55. Pulkownik guessed that from the time he first yelled at Salinas to "show me your hands" to the time the officers opened fire, no more than 5 minutes had elapsed. <u>See</u> Pulkownik Depo. 60:18-61:13. No weapons were found in the planter, and Salinas was unarmed at the time of the shooting. <u>See</u> PUMF's 64, 65. The officers never asked Salinas if he had any knives or a gun. <u>See</u> PUMF's 66, 68. Salinas was not asked if he was going to shoot or hurt the officers. <u>See</u> DUMF 67. Salinas had not been suspected of committing any crime, but a detention was being attempted pursuant to California Welfare & Institutions Code § 5150. <u>See</u> PUMF's 103, 104.

The Fresno County Sheriff's Department ("FCSD") conducted administrative and criminal investigations of the shooting. <u>See</u> DUMF 96; PUMF 69. The FCSD investigations ultimately concluded that the shooting of Salinas was justified. <u>See</u> Ramirez Depo. 44:5-21. The FCSD investigators reported to the scene about 4:18 p.m. <u>See</u> Buenrostro Depo. 29:5-8.

Boust, Little, Pulkownik, and Yambupah stood together in an area near the auto shop. PUMF 77. Chief Rodriguez later arrived on the scene. <u>See</u> Rodriguez 71:9-16. Boust briefed Chief Rodriguez on what had happened, <u>see</u> PUMF 75, including a statement that Salinas had sprung out at the officers very rapidly. <u>See</u> Rodriguez Depo. 72:8-73:19. Chief Rodriguez also spoke briefly to Little and McCahill. <u>See id.</u> 73:16-25.

Boust, Little, Pulkownik, and Yambupah remained at the scene for about a half-hour. PUMF 78. These officers then reported to the SPD station where they were placed in a briefing room together. <u>See</u> PUMF 79. SPD Policy 310.5.5 provides: "Any request for department or legal representation will be accommodated, however, no involved officer shall be permitted to meet collectively or in a group with an attorney or any representative prior to providing a formal interview or report." <u>See</u> PUMF 88. SPD Policy 310 indicates that the prohibition about meeting with an attorney collectively or in groups is to "maintain the integrity of each individual officer's statement." Plaintiff's Ex. EE.[3] Despite this policy, before any interviews occurred, these officers

---

[3] This is consistent with the testimony of Det. Ramirez, who was one of the FCSD investigators. Ramirez testified that group consultations with an attorney tend to "cloud a case"." Ramirez Depo. 62:3-12.

1   met collectively with their attorney.  See PUMF 80.  Also, at some point, Chief Rodriguez stepped

2   into the briefing room, when at least 3 of the 4 officers were present.  See Rodriguez Depo. 82:14-

3   83:18.

4           Investigators interviewed McCahill at the SPD station.  PUMF 82.  After McCahill was

5   interviewed, the investigators were told by an attorney for Boust, Little, Pulkownik, and

6   Yambupah that the attorney needed more time to talk to the officers in order to decide whether the

7   officers would be giving a statement.  See Buenrostro Depo. 40:4-41:23.  After additional requests

8   by the investigators, Boust and Pulkownik were interviewed that night, Little was interviewed the

9   next day, and Yambupah was interviewed 10 days later.  See PUMF's 84, 85, 86, 87.

10          During the interviews, Boust stated that Salinas "broke into a sprint" and "came at us full

11  speed"; Little described Salinas as having "charged"; Pulkownik stated that Salinas "tilted forward

12  in a full sprint"; and Yambupah stated that Salinas "sprinted" towards them.  See PUMF's 91, 92,

13  93, 94.  In his deposition, Boust testified that Salinas "was coming hard, he stepped out and then,

14  boom, it was a – he made a charge towards us," and Salinas stepped out of the planter and "makes

15  a charge straight towards me."  Boust Depo. 47:6-15, 48:10-14.  In his deposition, Little testified

16  that Salinas "just started running at us, like straight ahead."  Little Depo. 37:20-24.  In his

17  deposition, Pulkownik testified that to him, Salinas went into a "full-speed run."  Pulkownik

18  Depo. 55:7-10, 57:24-58:2.  In her deposition, Yambupah testified that Salinas "lunged" from the

19  planter, was not stopped by two beanbag rounds from Pulkownik, and that Salinas's left hand was

20  going towards a black shiny object on the left side of his hip.  See Yambupah Depo. 38:5-41-20.

21          The SPD Shooting Review Board ("the Board") absolved the City officers of any

22  wrongdoing in the shooting of Salinas.  See Plaintiff's Ex. X; see also PUMF 134.  Pursuant to

23  department policy 302.2, the Board was tasked to "objectively evaluating the use of force" by the

24  City officers.  See PUMF 142.  The Board appears to have considered SPD policies regarding

25  lethal and less lethal force, the FCSD internal affairs investigation, and the FCSD homicide

26  bureau's investigation.  See Plaintiffs' Ex. X.  The Board adopted the City officers' contention

27  that "Mr. Salinas stood to his feet and ran towards officers while reaching for his left side."  See

28  PUMF 137.  The Board also adopted the contention that the beanbag "had no apparent effect" on

1   Salinas.  See PUMF 138.  After considering the Board's findings, as well as the findings of the

2   two investigations by the FCSD, Chief Rodriguez adopted the Board's conclusion that the City

3   officers' use of force was justified.[4]  See PUMF 145; Rodriguez Depo 119:14-123:23.

4         A video of the shooting was taken on a cellphone by a bystander.  See PUMF 95.  The

5   submitted video lasts approximately 15 seconds.  See Plaintiff's Ex. LL.[5]  The bystander is facing

6   the planter, and four officers' backs are clearly seen (it does not appear that Yambupah is seen on

7   the video).  See id.  The video depicts Salinas emerging from the planter towards the officers and

8   the bystander.  See id.  The video does not depict Salinas running, sprinting, or lunging, rather it

9   depicts Salinas taking a step down from the elevated planter.[6]  See id.  Salinas's left hand is not at

10  his side, but is away from his body, at the time the first beanbag round is fired.  See id.  Further,

11  based on audio from the video, the time between the first beanbag round and the AR-15 shots is

12  practically simultaneous, although the beanbag shotgun appears to have been fired first.  See id.

13        POST is a state-wide quasi-governmental organization composed of law enforcement

14  executives and advisors.  DUMF 103.  POST sets standards for the basic and continued training of

15  peace officers, and certifies local law-enforcement agencies and their officers as being in

16  compliance with those standards.  See id.  In addition, POST reviews and certifies training courses

17  developed by local law-enforcement agencies as in compliance with POST standards and

18  expectations.  See id.  POST conducts regular audits of local agencies and officers to determine

19  compliance, and certifies those agencies and offices that are in compliance.  See id.  The SPD

20  received POST-certification in 1963.  See DUMF 109.  Among the requirements for an agency to

21  obtain POST-certification, the agency must agree to abide by POST standards and only employ

22  POST-certified officers.  See id.

23

24  [4] Pursuant to department policy 302.4.2, Chief Rodriguez was required to "make a final determination as to whether the employee's actions were within policy and procedures," and "determine whether any additional actions, investigations, or reviews are appropriate."  PUMF 144.

25

26  [5] The DVD contains an enlarged, two normal speed, a half-speed, and a quarter speed versions of the event.

27  [6] The view of the incident is somewhat obscured, but does show Salinas moving towards the officers and out of the planter.  See Plaintiffs' Ex. LL.  Defendants object to Plaintiff's interpretation of what the video actually depicts.  The Court views the evidence in the light most favorable to Plaintiff as the non-moving party.  See Narayan, 616 F.3d at

28  899; Blankenhorn v. City of Orange, 485 F.3d 463, 468 n.1 (9th Cir. 2007).  So viewing the video, Plaintiff's interpretation is reasonable and will be credited for purposes of this motion.  See id.; PUMF's 96, 97, 98, 99.

POST Learning Domain 37 addresses appropriate tactics and methods of interaction with a person suffering from a mental illness.  See DUMF 105; PUMF 105.  According to POST Learning Domain 37, an officer should attempt to "calm the situation" when encountering an emotionally distraught and suicidal individual by, among other steps, moving slowly, assuming a quiet nonthreatening manner when approaching and conversing with the individual, explaining intended actions before taking action, taking time to assess the situation, providing assurance that the officers are there to help, and giving the person time to calm down.  See PUMF 105.  Learning Domain 37 also teaches officers to avoid threatening the individual with arrest or in any other manner since "threats may create additional flight, stress, or potential aggression."  PUMF 106.

SPD has a written policy for handling mental illness commitments.  See PUMF 107.  Pursuant to Policy 418.1, commitment of a person under Welfare & Institutions Code § 5150 does not constitute an arrest.  See PUMF 107.  As with POST Learning Domain 37, Policy 418.3 addresses the necessity for "conflict resolution and de-escalation techniques," and requires officers to consider alternatives to "deadly force" (if circumstances permit) when interacting with a person with mental illness.  See PUMF 108; Plaintiff's Ex. FF.  Policy 418.6 provides that, as a "part of advanced officer training programs, this agency will endeavor to include POST approved training on interaction with mentally disabled persons as provided by Penal Code § 13515.25."  Plaintiff's Ex. FF.  The POST training courses have been available to law enforcement agencies since 2006, and the courses utilize interactive training methods to ensure that the training is as realistic as possible.  See PUMF's 111, 112.

On January 30, 2012, Cpl. Callahan sent to Deputy Chief Johnson a memorandum on the subject of "Policy and Training Information."  See Plaintiff's Ex. Z.  The memo explained that Cpl. Callahan was to conduct a policy review on portions of SPD policies that "might create a liability issue . . . ."  Id.  Cpl. Callahan identified Policy 418.6 and explained:  "This policy section mandates POST approved training on the interaction with mentally disabled persons as part of advanced officer training.  The department has not offered this type of training during my seven year tenure."  Id.  Cpl. Callahan concluded the memo by noting that various policies, including Policy 418, "should be satisfied with POST DVD's, which have been ordered, received, and

1   delivered to Sgt. Velasquez.  He will make the DVD and POST roster available to patrol staff."

2   Id.

3          SPD also has a policy regarding patrol rifles.  See Plaintiff's Ex. GG.  Due to the high-

4   powered nature of patrol rifles, Policy 432.5 requires City officers to successfully complete an

5   initial 24-hour patrol rifle's user's course with a certified patrol rifle instructor before they are

6   issued a patrol rifle.  See PUMF 120.  Following a City officer's certification from the initial

7   training, Policy 432.5 states that the officers are "required to successfully complete quarterly

8   training and qualifications conducted by a certified patrol rifle instructor."  PUMF 121.  The

9   operation of a patrol rifle is considered a perishable skill, and recertification is important because

10  SPD wants the officers to be able to use the weapon accurately and safely.  See PUMF 118;

11  Rodriguez Depo. 32:15-25.  Recertification is primarily to ensure that the officers are proficient in

12  the use of the patrol rifle.  See id.  If an officer fails to complete two or more training/qualification

13  sessions within a calendar year, SPD 432.5 states that the officer is "no longer authorized to carry

14  the patrol rifle without successfully retaking the initial patrol officer user's course and

15  qualification."  PUMF 122.  SPD Policy 432.5 limits the use of patrol rifles to "circumstances

16  where the officer can articulate a reasonable expectation that the rifle may be needed."  Plaintiff's

17  Ex. GG.  Policy 432.6 lists non-exclusive situations in which the deployment of a patrol rifle may

18  be appropriate, including situations in which a suspect is wearing body armor, where the officer

19  anticipates an armed encounter, or where the suspect is barricaded.  See id.

20         In a letter dated January 24, 2012, from Cpl. Callahan to Deputy Chief Johnson, Callahan

21  wrote that the "vast majority of officers . . .  have not completed the initial [24 hr.] training course

22  as required by policy section 432."  Plaintiff's Ex. Y.  Understanding the foreseeable risk and

23  serious consequences of untrained armed officers, Cpl. Callahan recommended that the high-

24  power firearms be confiscated from the officers that had not successfully completed the required

25  training.  PUMF 126.  At the time of the encounter with Salinas, Boust had last qualified on a

26  patrol rifle in March 2010, Little had requalified on his patrol rifle in September 2010, and

27  Yambupah completed one patrol rifle training in 2011 and 2012.  See PUMF's 127, 128, 129.

28

1 **DEFENDANTS' MOTION**

2 **I.**      **Excessive Force**

3      *Defendants' Argument*

4      Defendants argue that their use of force was reasonable.  Salinas's conduct implicated

5 Penal Code § 148(a)(1), which is a dangerous offense.  Salinas admitted during the 911 call that he

6 was armed with a gun and two knives, and Salinas's conduct bolstered the belief that he was

7 armed, i.e. he repeatedly reached down into the bushes, refused to show his hands, had a bulge on

8 his side that resembled a holster, and refused to obey commands.  Despite talking with the

9 officers, Salinas took a bladed stance and came at the officers while moving his hand towards his

10 hip.  The officers believed that Salinas was reaching for a gun, and thus, the officers faced a life-

11 threatening danger to their safety, and to the safety of others (the civilians at the auto shop).  No

12 alternative means of subduing Salinas were available.  Retreat was not viable because no cover

13 was readily present, and retreating to find cover could have exposed the officers to gun fire from

14 Salinas, or permitted Salinas to escape or take hostages from the auto shop.  Although a K-9 unit

15 was in route, Salinas's conduct forced the officers' to act.  While Salinas was suicidal and wanted

16 to commit suicide by cop, this desire does not mean that officers had to endanger their own lives

17 by allowing Salinas to act dangerously.  Finally, in terms of a warning, Salinas was facing

18 multiple officers with drawn guns, was being ordered to show his hands, and had made a 911 call

19 in which he said he was armed.  Salinas knew what would happen when he threatened the officers.

20      Alternatively, Defendants argue that they are entitled to qualified immunity.  The Ninth

21 Circuit has unambiguously stated that where a suspect threatens an officer with a weapon such as a

22 gun or a knife, the officer is justified in using deadly force.  The officers argue that they were

23 confronted with a former Marine who reportedly was carrying a gun, ignoring commands, and

24 coming at the officers while reaching for a something that was believed to be a gun.  This was a

25 clear situation of an officer being threatened by a suspect.  Any mistake in the use of force was

26 reasonable under the circumstances.

27      *Plaintiff's Opposition*

28      Plaintiff argues that summary judgment is improper.  The evidence shows that Salinas was

12

1  not under arrest or suspected of committing a serious crime.  He did not hurt anyone and had

2  emphatically denied that he would hurt anyone.  Salinas was emotionally distraught and in need of

3  help.  He complied with commands.  Salinas showed his hands on several occasions and nothing

4  was in them, he stepped out from the bushes and it was apparent that nothing was in his hands, and

5  he was stepping out of the planter.  Salinas was a danger to himself, but not to others.  Contrary to

6  the officers' contentions, the video shows that Salinas was stepping out from the planter and that

7  his left arm was away from his body at the time the shots were fired.  The officers never warned

8  Salinas that he would be shot.  The officers also did not consider less lethal options, including

9  tasers or taking cover until the K-9 unit arrived.  The officers failed to use de-escalation tactics and

10  failed to follow the methods of interacting with mentally ill individuals under POST Learning

11  Domain 37.  Finally, the officers' credibility is at issue because of the group meetings immediately

12  after the shooting and with the attorney at the SPD station.  The video is inconsistent with the

13  officers' account of Salinas's actions at the time shots were fired.

14  　　　With respect to qualified immunity, the law was sufficiently established that a reasonable

15  officer would have known that the City officers' actions were improper.  Where, as here, there is

16  no threat posed to officers or to bystanders, use of deadly force is unlawful.

17  　　　*Legal Standard*

18  　　　1.　　Excessive Force

19  　　　All claims that law enforcement officers used excessive force, either deadly or non-deadly,

20  in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under

21  the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S.

22  372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly

23  force do not fit into their own separate category with their own set of "rigid pre-conditions" that

24  must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S. at

25  382-83; Hooper v. County of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011).  The pertinent

26  question in excessive force cases is whether the use of force was "objectively reasonable in light

27  of the facts and circumstances confronting [the officers], without regard to their underlying intent

28  or motivation."  Graham, 490 U.S. at 397; Hooper, 629 F.3d at 1133.  The objective inquiry into

1    reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d

2    546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and

3    then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City

4    of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007). Factors that are considered in assessing the

5    government interests at stake include, but are not limited to, "the severity of the crime at issue,

6    whether the suspect poses an immediate threat to the safety of the officers or others, and whether

7    he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396;

8    Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054.  Where it is or

9    should be apparent that an individual is emotionally or mentally unstable, that is a factor that must

10   be considered in determining the reasonableness of the force employed.  See Luchtel, 623 F.3d at

11   980; Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  Courts also are to

12   consider whether it was feasible to give a warning before using force, and whether a warning was

13   actually given.  See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010).  "In some cases . . .

14   the availability of alternative methods of capturing or subduing a suspect may be a factor to

15   consider."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at

16   980.  However, police officers "are not required to use the least intrusive degree of force possible"

17   as long as the force actually used was reasonable.  Forrester v. City of San Diego, 25 F.3d 804,

18   807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008).  That is,

19   a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive

20   alternative will not render conduct unreasonable."  Wilkinson, 610 F.3d at 551.  It may also be

21   appropriate to consider the parties "'relative culpability,' i.e. which party created the dangerous

22   situation and which party is more innocent, may also be considered."  Espinosa v. City & County

23   of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384.  Reasonableness

24   "must be judged from the perspective of a reasonable officer on the scene, rather than with the

25   20/20 vision of hindsight."  Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550.  "The calculus

26   of reasonableness must embody allowance for the fact that police officers are often forced to make

27   split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about

28   the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-97;

14

1  Wilkinson, 610 F.3d at 550.  "Force is excessive when it is greater than is reasonable under the

2  circumstances."  Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

3        2.      Qualified Immunity

4        A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

5  Katz, 533 U.S. 194, 200-02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n.6 (9th Cir.

6  2008).  However, lower courts need not strictly follow the tiered sequence in analyzing qualified

7  immunity, but instead have the discretion to dispose of the issue at step two without addressing

8  step one.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); Glenn v. Washington County, 673 F.3d

9  864, 870 (9th Cir. 2011).  Under the first step, the court determines whether, "taken in the light

10  most favorable to the party asserting the injury, do the facts show the officer's conduct violated a

11  constitutional right?"  Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th

12  Cir. 2008).  All factual disputes are resolved in favor of the party asserting the injury.  See Saucier,

13  533 U.S. at 201; Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013).    If the

14  answer to the question is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer

15  is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173.

16  Under the second step, the court determines "whether the right was clearly established," and

17  applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir.

18  2007); see Saucier, 533 U.S. at 202.  The critical question is whether "the contours of the right

19  were sufficiently clear that a reasonable official would understand that what he is doing violates

20  the right."  Saucier, 533 U.S. at 202; Inouye, 504 F.3d at 712.  Whether a right is clearly

21  established must be "undertaken in light of the specific context of the case, not as a broad general

22  proposition."  Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173.  If the officer could have

23  reasonably, but mistakenly, believed that his conduct did not violate a clearly established

24  constitutional right, then the officer will receive qualified immunity.  See Saucier, 533 U.S. at

25  205-06; Johnson v. County of L.A., 340 F.3d 787, 794 (9th Cir. 2003).

26        *Discussion*

27        1.      Constitutional Violation

28        As indicated above, the Court must examine not only certain enumerated considerations,

1   but any other pertinent consideration that is part of the totality of the circumstances.

2       There are two quantums of force at issue – rifle fire and beanbag rounds from a less lethal

3   shotgun.  Beanbag rounds are less than deadly, but they can cause serious injury, especially at

4   close ranges; they are a significant quantum of force.  See Glenn v. Washington Cnty, 673 F.3d

5   864, 871-72 (9th Cir. 2011); Deorle v. Rutherford, 272 F.3d 1272, 1279-80 (9th Cir. 2001).

6   Beanbag rounds are "permissible only when a strong governmental interest compels the

7   employment of such force."  Glenn, 673 F.3d at 872; Deorle, 272 F.3d at 1280.  An AR-15 rifle

8   represents an extremely high quantum of force, it is deadly force.  See Thompson v. Mercer, 762

9   F.3d 433, 436-38 (5th Cir. 2014); George v. Morris, 736 F.3d 829, 832, 837-38 (9th Cir. 2013).

10  "An officer's use of deadly force is reasonable only if the officer has probable cause to believe

11  that the suspect poses a significant threat of death or serious physical injury to the officer or

12  others."  Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

13      In terms of the crime at issue, the officer's memorandum cites to Penal Code § 148(a)(1),

14  which prohibits willfully obstructing or delaying a peace officer in the discharge of his duties, this

15  is a misdemeanor.  See Cal. Pen. Code §§ 17(b), 148(a)(1); Young v. County of L.A., 655 F.3d

16  1156, 1164 (9th Cir. 2012).  Violations of § 148 "will tend to justify force in far fewer

17  circumstances than more serious offenses, such as violent felonies."  Young, 655 F.3d at 1165.

18  The non-violent violation of § 148(a)(1) "will not, without more, give rise to a significant

19  governmental interest in the use of significant force."  Id.  Additionally, Salinas's conduct

20  reasonably implicated Welfare & Institutions Code § 5150, which permits a peace officer to detain

21  and admit an individual to a mental health facility for 72 hours if the individual is a threat to

22  himself.  See Cal. Wel. & Inst. Code § 5150(a).  Although not a crime, § 5150 may support a

23  lawful detention.  See Bias v. Moynihan, 508 F.3d 1212, 1220 (9th Cir. 2007).  There is an

24  important governmental interest in getting an individual medical attention who appears to be a risk

25  to himself due to a mental disorder.  But, "the use of force that may be justified by that interest

26  [i.e. the interest to provide psychiatric help] necessarily differs both in degree and in kind from the

27  use of force that would be justified against a person who has committed a crime or who poses a

28  threat to the community."  Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010).

Whether a suspect poses an immediate threat to the safety of the officers or others, i.e. the immediacy of the threat posed by a suspect, is the most important factor in evaluating excessive force.  See Gonzalez, 747 F.3d at 793.  In excessive force cases in which a death results, the Ninth Circuit has cautioned that summary judgment is to be granted sparingly and that the entirety of the evidence is to be carefully examined because often times the only surviving witnesses to the use of force are the defendants.  See id. at 794-95.  Here, the City officers contend that Salinas's left arm was reaching for a bulge near his hip/waist, see DUMF 81, and that he "came" at the officers (the individual officers indicated Salinas charged, lunged, ran, jumped, or sprinted).[7]  See DUMF 78, 80, 81.  Defendants' also contend that they believed Salinas may have had a weapon on him, either a firearm or a knife.  Plaintiff contends that Salinas showed the officers his empty hands on several occasions and that when Salinas stood, the officers could see that he had nothing in his hands.  See PUMF 38, 39, 40, 43.  Plaintiff also contends that Salinas was not reaching for his hip/waist with his left hand, and that he was stepping out of the planter per the officers' instructions.  See PUMF's 44, 45, 96, 97, 98, 99.

The Court finds the statements of Deputy McCahill and the cellphone video to be the key considerations in terms of the threat posed by the Salinas.  It is true that Salinas himself reported that he was armed.  However, McCahill's statements and testimony indicate that the officers saw empty hands while Salinas was seated, and they would have been able to see that Salinas did not have a gun or weapon in his hands while he was standing.  See McCahill Statement at 10:15-20; McCahill Depo. 72:24-74:14.  Thus, for purposes of this motion, the officers could see that Salinas had no weapons in his hands near the time when the shots were fired.  See Narayan, 616 F.3d at 899.  In terms of Salinas's own actions, the video's importance cannot be overstated.  Viewing the video in the light most favorable to Plaintiff, the video shows that Salinas's left arm was away from his body when the first shots were fired.  The evidence does not indicate that Salinas's left arm was reaching for the bulge at his waist/side.  The video also shows Salinas was merely stepping down from the planter.  The video does not show Salinas running, sprinting, charging,

_____

[7] By contending that Salinas "came" at them, Defendants are somewhat sanitizing their individual testimony.  As discussed above, the officers actually used terms such as "running," "sprinting," "charging," and "lunging."  However, the Court notes that some of these words were acknowledged in DUMF 80.

17

1  lunging, or jumping.  Defendants do not dispute that Salinas had been ordered to come out of the

2  elevated planter several times.  Given McCahill's testimony and the video, Salinas did not pose an

3  immediate threat to the offices or to others at the time the beanbag rounds and the AR-15 rounds

4  were fired.  Cf. Blankenhorn v. City of Orange, 485 F.3d 463, 468 n.1, 478-80 (9th Cir. 2007)

5  (relying in part on video to deny summary judgment on excessive force claims).

6       In terms of active resistance or evasion, at the time force was utilized, Salinas was not in

7  flight and he was not physically resisting the officers.  It is true that Salinas had earlier fled and

8  had been hiding in the planter, but at the time force was used, he was no longer in flight and was

9  clearly not hiding.

10      As to alternate methods of detaining/subduing Salinas, at least two alternative measures

11  appear possible to the beanbag and AR-15 rounds.[8]  First, the officers were armed with tasers.

12  Tasers are considered a less lethal force option, and they are intended to cause temporary

13  paralysis/incapacitation.  See Bryan, 630 F.3d at 825-26.  It is unknown why the officers did not

14  draw or deploy a taser in this situation.  Second, the officers never backed up or gave Salinas

15  additional orders, such as "freeze" or "stop."  Salinas was not charging, he merely stepped down.

16  It is unknown why the officers could not have taken a step back and/or issued additional orders.[9]

17  Additionally, with respect to the AR-15 shots, the beanbag rounds were a less lethal option.  The

18  video shows nearly simultaneous firing of the beanbag shotgun and the AR-15's, with the beanbag

19  shotgun apparently having been shot first by a split second.  McCahill did not shoot his firearm

20  because he wanted to see the effects of the beanbag rounds, see PUMF's 56, 57, but per the video,

21  Boust, Little, and Yambupah did not wait to observe the effects of the shotgun.

22      In terms of Salinas's mental state, Salinas was clearly emotionally disturbed.  See

23  Drummond, 343 F.3d at 1058.  Salinas self-reported as being suicidal, indicated to the 911

24  operator that he wanted the officers to kill him, told Pulkownik that he was worthless and that no

25  one cared, and explained that he did not want the City officers to shoot him but rather wanted

26  ───────────────
[8] The parties have not addressed this consideration in depth.

27  [9] Plaintiff suggests a third option:  the officers could have moved into cover and waited until the K-9 unit arrived.
28  However, Defendants have indicated several draw backs to this suggestion, and the video does not appear to indicate
   that much cover was readily available.

McCahill to shoot him.  However, he also informed the 911 operator, and the officers were given this information, that he would not hurt the officers.  Although Salinas's mental/emotional condition or expressed desire to commit "suicide by cop" did not require that the officers endanger themselves, see Lal v. California, 746 F.3d 1112, 1117 (9th Cir. 2014), Salinas's actions did not pose an immediate threat to the officers.

Finally, with respect to a warning, the video suggests that a warning could have been given.  Given Salinas's mental state, and his failure to comply with some (but not all) of the orders that had been given to him by various officers, he might not have heeded a warning.  Nevertheless, Salinas did not appear to have been moving quickly, and it is unknown why the officers could not have at least given Salinas a warning that they would fire if he did not stop.

Under these circumstances, a reasonable jury could find that excessive force was used.  Salinas was a mentally disturbed individual threatening suicide.  When he was shot, no warnings were given and alternative methods were not used.  Of paramount importance, Salinas was not reaching for anything and was not lunging, running, or sprinting towards the officers, he was simply stepping down.  Salinas was not an immediate threat.  Therefore, summary judgment on this issue is improper.  Gonzalez, 747 F.3d at 793-95; Blankenhorn, 485 F.3d at 468 n.1, 478-80.

2.    Qualified Immunity

Viewing the evidence in the light most favorable to Plaintiff, Salinas did not appear to be moving quickly, had nothing in his hands, and was not reaching for his hip/waist when shots were fired, rather he was merely stepping down from the planter.  Therefore, Salinas did not pose an immediate threat to the officers.

With respect to the use of the AR-15, prior to June 2012, "[c]ase law clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others."  Wilkinson, 610 F.3d at 550; Scott v. Henrich, 39 F.3d 912, 914 (9th Cir. 1994).  Because Salinas posed no immediate threat, qualified immunity will be denied as to Boust, Little, and Yambupah.  See Wilkinson, 610 F.3d at 550; Scott, 39 F.3d at 914

With respect to the beanbag round, prior to 2012, the Ninth Circuit had recognized that beanbag rounds can cause serious injury and that their use is "permissible only when a strong

1   governmental interest compels the employment of such force."  <u>Glenn</u>, 673 F.3d at 872; <u>Deorle</u>,

2   272 F.3d at 1280.  Because Salinas was not an immediate threat, was not actively resisting or

3   evading arrest, and was not suspected of committing a serious offense, qualified immunity will be

4   denied as to Pulkownik.  <u>See</u> <u>Glenn</u>, 673 F.3d at 872; <u>Deorle</u>, 272 F.3d at 1280.

5

6   **II.**      ***Monell* Liability**

7      *Defendant's Argument*

8         The City argues that it adheres to the law and that no policies, customs, or practices caused

9   a constitutional violation.  Plaintiff has not identified other incidents of constitutional violations,

10  and merely relying on the circumstances of this incident is not sufficient.  Further, there was no

11  inadequate training.  SPD's training programs met or exceeded the standards set by POST, and all

12  SPD officers (including the defendant officers) had successfully completed Academy and Field

13  Training, and had biannual update training.  Nothing about SPD's training indicates a deliberate

14  indifference for the rights of others.  Plaintiff cannot establish a causal relationship between any

15  SPD custom, policy or practice, and any excessive force that may have occurred.  SPD policies

16  and Academy training apprised the officers of the lawful use of force, and SPD ensured that its

17  officers received the most up to date constitutional information possible.

18        In reply, the City argues that neither Policy 418 nor Penal Code § 13515.25 actually

19  require advance training to deal with the mentally ill.  Policy 418 says that SPD "will endeavor to

20  include POST approved training," and § 13515.25 states that the "Legislature encourages law

21  enforcement agencies" to include additional POST training.  Moreover, although Plaintiff cites to

22  a memo from Cpl. Callahan, Plaintiff omits a portion that reads:  "Sections . . . 418:  should be

23  satisfied with POST DVD's, which have been ordered, received, and delivered to Sergeant

24  Velasquez.  He will make the DVD and POST roster available to patrol staff."  There is no

25  evidence that actually indicates deliberate indifference by SPD, and there is no evidence of prior

26  incidents in which SPD officers shot and killed a mentally ill individual.

27        Also in reply, the City argues that Plaintiff does not dispute that all City officers were

28  required to complete 24 hours of updated firearms training every 2 years, that three of the four

officers had completed this training, and that three of the four officers had completed SPD's initial training course on patrol rifles.  This concession alone show that there was no inadequate firearms training.  There is no POST perishable skills requirement for patrol rifles, just firearms generally.  Questions of firearms proficiency involve general understanding, use, and handling of firearms and not every particular weapon.  A focus on elective training that is outside of POST requirements is inappropriate.  Plaintiff has not shown deliberate indifference, or that SPD disregarded prior instances of improper patrol rifle use in the absence of quarterly training.  Furthermore, there is no causal link.  The officers hit their targets, and even had the offices used their handguns a bullet from a handgun would have resulted in death.  It was Salinas's conduct that caused his death.  Had Salinas initially surrendered he would still be alive.

*Plaintiff's Opposition*

Plaintiff argues that Policy 418 required SPD to provide POST approved training on the interaction with mentally disabled persons as part of the advanced officer training.  By a January 2012 memo, SPD had not provided such training for at least 7 years.  A written policy serves no purpose if it is not followed.  The officers in this case failed to use the de-escalation efforts of POST Learning Domain 37 and Policy 418, which resulted in Salinas's death.  The absence of a training program was the moving force behind Salinas unnecessary death.  That constitutional deprivations would be suffered by persons with mental illness due to the complete failure to properly train its officers should have been obvious to SPD.  Further, SPD condoned and ratified the egregious mishandling of a person with a mental illness when the board concluded that the officers' handling of the situation and use of force was justified.

Plaintiff also argues that SPD acknowledged that its officers were being assigned patrol rifles without completing the mandated training.  SPD's training supervisor strongly recommended that these officers return their patrol rifles until they received the required training.  Boust, Little, and Yambupah spontaneously fired 22 shots from the rifles, and none of these offices had completed the required training mandated by Policy 432.  The Board ignored this barrage of shots at an emotionally distraught and suicidal man, and instead ratified the decision to use deadly force.

1          *Legal Standard*

2          Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

3   liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658,

4   690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A

5   municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other

6   words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior*

7   theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185.  Liability only attaches where the

8   municipality itself causes the constitutional violation through "execution of a government's policy

9   or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

10  represent official policy."  Monell, 436 U.S. at 694; Ulrich v. City & County of San Francisco,

11  308 F.3d 968, 984 (9th Cir. 2002).

12         In limited circumstances, a government's failure to train may rise to the level of an official

13  policy, but municipal "culpability for a deprivation of rights is at its most tenuous where a claim

14  turns on a failure to train."  Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011).  A municipality's

15  failure to train its employees may create § 1983 liability where the "failure to train amounts to

16  deliberate indifference to the rights of persons with whom the [employees] come into contact."

17  Connick, 131 S.Ct. at 1359; City of Canton v. Harris, 489 U.S. 378, 388 (1989).  To recover for a

18  failure to train, a plaintiff must show:  (1) he was deprived of a constitutional right, (2) the

19  municipality had a training policy that "amounts to deliberate indifference to the [constitutional]

20  rights of the persons with whom [its police officers] are likely to come into contact;" and (3) his

21  constitutional injury would have been avoided had the municipality properly trained those officers.

22  Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007); Lee, 250 F.3d at 681.  The

23  inadequate training must have "actually caused" the deprivation of rights.  Marsh v. County of San

24  Diego, 680 F.3d 1148, 1159-60 (9th Cir. 2012); Merritt v. County of Los Angeles, 875 F.2d 765,

25  770 (9th Cir. 1989).  "Deliberate indifference is a stringent standard of fault requiring proof that a

26  municipal actor disregarded a known or obvious consequence of his action."  Connick, 131 S.Ct.

27  at 1360; Flores v. County of L.A., 758 F.3d 1154, 1158 n.10 (9th Cir. 2014).  "Mere negligence in

28  training or supervision . . . does not give rise to a *Monell* claim."  Dougherty v. City of Covina,

654 F.3d 892, 900 (9th Cir. 2011).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference' for purposes of failure to train."  Connick, 131 S.Ct. at 1360; Flores v. County of L.A., 758 F.3d 1154, 1159 (9th Cir. 2014); see also Mueller v. Auker, 700 F.3d 1180, 1194 (9th Cir. 2012).  However, "in a narrow range of circumstances," a pattern of similar violations may not be necessary where violations of constitutional rights are the "highly predictable consequence" of a failure to train.  Connick, 131 S.Ct. at 1361; Flores, 758 F.3d at 1159.  Finally, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable."  City of Canton, 489 U.S. at 391.  "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County."  Merritt, 875 F.2d at 770; see also Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921, 931-32 (9th Cir. 2001).

*Discussion*

Plaintiff raises three bases for *Monell* liability:  (1) ratification of the shooting of Salinas by the Board; (2) failure to properly train on handling people with mental illnesses; and (3) violation of policy 432.  The Court will address each theory separately.

1.   Ratification

A municipality may be liable if a policymaker, i.e. an official with final policy making authority, ratified the unconstitutional conduct of a subordinate and the basis for it.  See Sheehan v. City & County of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014); Clouthier v. County of Contra Costa, 591 F.3d 1232, 1250 (9th Cir. 2010).

Here, there are two problems with Plaintiff's theory.  First, the report indicates that in making its decision the Board considered SPD policies regarding lethal and less lethal force, the FCSD's internal affairs investigation, and the FCSD's homicide bureau's investigation.  See Plaintiffs' Ex. X.  There is no evidence that the Board ever had access to or saw or considered the videotape, and it is the videotape that creates significant questions regarding the use of force against Salinas.  Second, there is no evidence that the Board had final policy-making authority.  In fact, the Board's report was sent to Chief Rodriguez for review.  As such, the City cannot be liable based on any ratification that may have occurred by the Board in its report.

1        2.       Training On Mental Illness

2        Plaintiff does not identify a problem with Policy 418 itself.  Rather, Plaintiff's position

3   appears to boil down to a contention that Policy 418 and Penal Code § 13515.25 required

4   continuing training, yet SPD failed to train for at least 7 years prior to the incident.  The Court is

5   not persuaded.

6        Penal Code § 13515.25 required POST to create continuing education classes by July 2006

7   that deal with peace officer interactions with mentally disabled individuals.  See Cal. Pen. Code §

8   13515.25(a).[10]  Penal Code § 13515.25 also "encouraged" law enforcement agencies to provide

9   the additional training as part of the "advanced officer training program."  Cal. Pen. Code §

10  13515.25(d).[11]  Two aspects of § 13515.25(d) are noteworthy.  First, the Legislature "encouraged"

11  agencies to include the new course in their training.  The language of § 13515.25 does not say

12  "shall include" or otherwise expressly require agencies to utilize the new POST continuing

13  education course.  The word "encourage" does not establish a requirement or create a mandatory

14  duty.  Cf. Porch v. Masterfoods USA, Inc., 364 Fed. Appx. 365, 366 (9th Cir. 2010) ("Being

15  encouraged but not required to eat lunch in the company cafeteria does not amount to being

16  'required . . . to work during any meal or rest period' . . . ."); Davis v. Richmond, F & P. RR. Co.,

17  803 F.2d 1322, 1330 (4th Cir. 1985) (noting that an employment practice was "encouraged by

18  federal officials, though not mandated."); Global Crossing Evelyn v. Kings Cnty Hosp. Ctr., 819

19  F.Supp. 183, 195 (E.D. N.Y. 1993) (noting that Congress wishing to encourage compliance "is not

20  the same as legislating such compliance."); Concerned Dublin Citizens v. City of Dublin, 214

21  Cal.App.4th 1301, 1315 (2013) (finding significant that a plan "states only that retail uses are

22  'encouraged' – not required."); County of L.A. v. Commission on State Mandates, 110

23  _____

24  [10] Penal Code § 13515.25(a) reads:  "By July 1, 2006, [POST] shall establish and keep updated a continuing education classroom training course relating to law enforcement interaction with mentally disabled persons. The training course shall be developed by the commission in consultation with appropriate community, local, and state organizations and

25  agencies that have expertise in the area of mental illness and developmental disability, and with appropriate consumer and family advocate groups. In developing the course, the commission shall also examine existing courses certified by

26  the commission that relate to mentally disabled persons. The commission shall make the course available to law enforcement agencies in California."

27  [11] Penal Code § 13515.25(d) reads:  "The Legislature encourages law enforcement agencies to include the course

28  created in this section, and any other course certified by [POST] relating to mentally disabled persons, as part of the advanced officer training program."

1  Cal.App.4th 1176, 1184 (2003) (noting that "local law enforcement agencies encouraged, but not

2  required, to provide updates."). Therefore, § 13515.25 did not require SPD to provide the new

3  continuing education/training course to its officers.[12]

4      As for Policy 418, that policy *inter alia* established guidelines for interacting with mentally

5  disabled individuals and addressed additional mental health training for patrol officers. As noted

6  above, Policy 418.6 provided that as "part of advanced officer training programs, this agency will

7  *endeavor* to include POST approved training on interaction with mentally disabled persons as

8  provided by Penal Code § 13515.25." Plaintiff's Ex. FF (emphasis added). The term "endeavor"

9  means to make an earnest attempt or to try, <u>see</u> Webster's New World College Dictionary 469 (4th

10  ed. 2008), it does not mean that something definitely will occur. By Policy 418.6's express

11  language, there is no requirement that the § 13515.25 course will actually be used.[13] It is true that

12  Cpl. Callahan indicated in a memo that training was mandated by Policy 418, but that is contrary

13  to the plain language of Policy 418. There is no evidence that Cpl. Callahan's characterization of

14  Policy 418 is the accepted interpretation by SPD.[14]

15      Even assuming that Policy 418 required that the § 13515.25 continuing education class be

16  included in SPD training, there is a problem. As noted above, Cpl. Callahan's January 30, 2012

17  memo stated that the concerns surrounding several policies, including Policy 418, "should be

18  satisfied with POST DVD's, which have been ordered, received, and delivered to Sgt. Velasquez.

19  He will make the DVD and POST roster available to patrol staff." Plaintiff's Ex. Z. Therefore,

20  there is an indication that any requirements imposed by Policy 418 would now be adequately

21  addressed because POST DVD's had been received and would be made available to SPD

22  ---

23  [12] The Court notes that the Legislature did not encourage agencies to include the course for all aspects of training, rather the course was only encouraged to be part of an advanced training program. Which officers are eligible for
24  advance training programs, or whether the City officers involved in the incident with Salinas were eligible for an advanced training program, is unknown. If the four City officers involved were ineligible or otherwise not required to take advance training programs, then the failure to offer the training was harmless.

25  [13] The Court notes that Policy 418.6 does not state that the course will be available to all officers, rather it limits the
26  course to an advanced training program. There is no evidence regarding SPD's advanced training programs or whether the four City officer's involved were eligible for advanced training programs.

27  [14] Defendants have quoted the deposition of Doug Johnson in their reply memorandum. The deposition excerpt
28  indicates that Johnson would disagree that Policy 418 mandated training, rather Johnson believed that Policy 418 "recommended" additional training. <u>See</u> Doc. No. 65 at 10:16-23.

1    personnel. This memo was issued about four months prior to the incident with Salinas. The

2    memo was ordered by a Deputy Chief, and reflects that SPD was concerned about its policies and

3    avoiding liability. There is no evidence that the DVD's were not made available as part of the

4    advanced training programs.[15] The memo, which identified possible policy problems and stated

5    that a solution was being implemented, does not reflect deliberate indifference by the City

6    regarding Policy 418.

7        In the typical failure to train case, a plaintiff must show other instances in which officers

8    have violated the constitutional rights of others. See Connick, 131 S.Ct. at 1360; Flores, 758 F.3d

9    at 1159. Plaintiff in this case has made no such showing. SPD has a policy regarding interactions

10   with mentally disabled individuals, and there has been no indication that Policy 418 is deficient or

11   inconsistent with Post Learning Domain 37. Although the four City officers in this case arguably

12   did not follow the commands of Policy 418, there is no evidence that Policy 418's dictates are

13   regularly violated by interactions between SPD officers and mentally disabled individuals. See

14   City of Canton, 489 U.S. at 391; Case v, 249 F.3d at 931-32 (". . . nor can liability be predicated

15   on the isolated sporadic events in this case."). Without notice that the rights of mentally disabled

16   individuals were more than sporadically being violated despite Policy 418, the City had no notice

17   that its training and policy was deficient and causing constitutional violations. See Mueller, 700

18   F.3d at 1194. That is, there is insufficient evidence of deliberate indifference.

19        Police interactions with mentally disabled individuals are not uncommon, and courts in this

20   circuit have permitted *Monell* claims to proceed when the policy/training at issue involves

21   interactions with the mentally disabled. See Kirby v. City of E. Wenatchee, 2013 U.S. Dist.

22   LEXIS 51920, *35-*37 (E.D. Wash. Apr. 10, 2013); Newman v. San Joaquin Delta Cmty. College

23   Dist., 814 F. Supp. 2d 967, 977-78 (E.D. Cal. 2011). In those cases, however, the key was an

24   absence of both a policy and training regarding interactions with mentally disabled individuals.

25   See id. Here, SPD has Policy 418, which appears to appropriately address interactions with the

26   mentally disabled. Further, although Cpl. Callahan's January 30, 2012 memo indicates that

27

---

28  [15] Again, there is no evidence that these four officers would have somehow been required to advanced training
programs or the § 13515.25 class in particular.

1   training had not been occurring, training through the received POST DVD's was being made

2   available to SPD officers and the DVD's were intended to address *inter alia* Policy 418.  These

3   facts make this case materially different from *Newman* and *Kirby*.

4           In sum, Policy 418 addresses interactions with the mentally disabled, and Plaintiff has

5   identified neither deficiencies within Policy 418 nor other incidents involving SPD personnel and

6   mentally disturbed individuals.  Plaintiff has not shown an actual violation of state law, POST

7   training mandates, or Policy 418.6.  Summary judgment in favor of the City on this failure to train

8   claim is appropriate.  See Flores, 758 F.3d at 1159-60; Mueller, 700 F.3d at 1194.

9           3.      Policy 432.5

10          Plaintiff focuses on SPD's alleged failure to enforce Policy 432.5.  Policy 432.5 required

11  officers to complete an initial 24-hour training course on patrol rifles before they could carry or

12  utilize a patrol rifle.  See Plaintiff's Ex. GG.  After completion of the 24-hour training course,

13  Policy 432.5 required the officers to have quarterly training and qualifications.  See id.  The failure

14  to complete two or more quarterly training qualifications per year disqualifies the officers from

15  using a patrol rifle, and the officer must retake the initial 24-hour training course.  See id.

16          As described above, the January 24, 2012 memo from Cpl. Callahan to Deputy Chief

17  Johnson identified a significant compliance problem with Policy 432.5.  According to the memo,

18  "the vast majority" of SPD personnel had not completed the initial 24-hour training course, but the

19  "vast majority" of SPD personnel had been issued patrol rifles.  See Plaintiff's Ex. Y.  Cpl.

20  Callahan recommended in part taking away patrol rifles "as a precaution" until the officers had

21  completed the initial 24-hour training course.  See id.

22          Here, the City acknowledges that three of the four City officers had completed the initial

23  24-hour training course.  See Doc. No. 65 at 12:6-7.  Based on training records submitted by the

24  City, it appears that Yambupah did not complete the initial 24-hour training course.  See Callahan

25  Dec. Exs. B, C, D.  Per Policy 432.5, Yambupah was ineligible to use or carry a patrol rifle.  See

26  Plaintiff's Ex. GG.  That Yambupah still had her patrol rifle nearly five months after Callahan's

27  memo is extremely troubling.  Nevertheless, there is a causation problem.  The video indicates that

28  Boust, Little, and Yambupah fired simultaneously, and each officer fired multiple shots.  See

27

Plaintiff's Ex. LL: PUMF's 50, 51, 52.  Plaintiff agrees that the three officers fired their AR-15

shots essentially simultaneously with the discharge of Pulkownik's beanbag gun.  See PUMF 47.

If Yambupah had been the only officer to fire her AR-15, causation would be clearer.  However,

the two officers who had received the initial 24-hour training also fired their patrol rifles.  That is,

the one officer who did not have the 24-hour training and the two officers who did have the 24-

hour training all essentially reacted at the same time and in the same way.  Under these

circumstances, the failure of SPD to ensure that Yambupah had completed her 24-hour initial

training course did not "actually cause" the shooting of Salinas.  See Marsh, 680 F.3d at 1159-60.

    With respect to Boust and Little, these officers do not appear to have been in full

compliance with Policy 432.5.  Boust and Little completed their initial 24-hour training, see

Callahan Dec. Exs. B, D, but they do not appear to have completed the quarterly training required

by Policy 432.5.  See PUMF 127, 128.  As a result, Policy 432.5 prohibited Boust and Little from

carrying or using a patrol rifle.  See Plaintiff's Ex. GG.  Their carrying and use of a patrol rifle

was therefore a violation of Policy 432.5.  See id.  Despite this violation of Policy 432.5, there is

insufficient evidence of deliberate indifference by the City.

    No evidence has been submitted that would have put the City on notice that there was a

problem with enforcing the quarterly training requirement.  First, as discussed above, Policy 432.5

has two separate training requirements: (1) an initial 24-hour training course, and (2) quarterly

training and certification.  See id.  Cpl. Callahan's January 24 memo put the City on notice of a

compliance problem with the first training requirement of Policy 432.5.  See Plaintiff's Ex. Y.

Critically, Cpl. Callahan's memo was concerned only with the initial 24-hour training.  See id.[16]

There is absolutely no discussion in the memo about Policy 432.5's quarterly training and

recertification requirement.  See id.  Thus, unlike the initial 24-hour training requirement that

affected Yambupah, the City was not expressly warned about compliance problems with the

---

[16] The Court notes that Plaintiff submitted PUMF 125, which stated that Cpl. Callahan warned Chief Johnson that
SPD officers had been issued patrol rifles without having satisfied the initial and recertification training.  See PUMF
125.  Plaintiff cited three staff reports/memos in support of this contention.  However, the two reports by Cpl.
Callahan, dated January 24, 2012 and February 2, 2012, relate exclusively to the 24 hour course, there is no discussion
about quarterly recertification.  See Plaintiff's Exs. Y, AA.  Further, the May 21, 2012 report/memo deals with policy
manual updates, it does not discuss recertification.  See Plaintiff's Ex. BB.  No evidence supports the assertion that
Cpl. Callahan or Chief Johnson was aware of any recertification issues.

1  quarterly training and recertification requirement.  It is the latter training requirement, and only the

2  latter training requirement, that impacts Boust and Little.  Second, a plaintiff generally must show

3  other instances of peace officers violating constitutional rights in order to show deliberately

4  indifferent training.  See Connick, 131 S.Ct. at 1360; Flores, 758 F.3d at 1159.  Plaintiff does not

5  criticize the substance of Policy 432, and she has not presented any evidence of other instances in

6  which SPD personnel misused a patrol rifle or engaged in any kind of excessive force.  Without

7  notice that the rights of citizens were more than sporadically being violated despite Policy 432.5,

8  the City had no notice that its training was deficient and causing constitutional violations.  See

9  Mueller, 700 F.3d at 1194.  At most, Plaintiff has shown an isolated incident of one aspect of

10  Policy 432.5 not being enforced.  This is insufficient to show inadequate training.[17]  See Clouthier,

11  591 F.3d at 1251 (finding that implementation of an internal policy had been faulty but that there

12  was insufficient evidence of a longstanding policy improper implementation or of notice that that

13  the deficiency in implementation would likely result in a constitutional violation); Case, 249 F.3d

14  at 931-32.

15          In sum, Plaintiff has shown violations of two parts of Policy 432.5.  However, Plaintiff has

16  not shown deliberate indifference with respect to quarterly training and has not shown that the

17  City's failure to ensure that Yambupah had completed the 24-hour initial training actually caused

18  the shooting.  Summary judgment in favor of the City on this failure to train claim is appropriate.

19  See Flores, 758 F.3d at 1159-60; Mueller, 700 F.3d at 1194; Marsh, 680 F.3d at 1159-60;

20  Clouthier, 591 F.3d at 1251; Case, 249 F.3d at 931-32.

21

22  **III.    Supervisory Liability**

23          *Defendant's Argument*

24          Defendants argue that there is no evidence of ratification by Chief Rodriguez.  Chief

25

26  ───────────

[17] The Court notes that there has been no evidence submitted that describes the nature of the quarterly recertification
training.  The testimony of Chief Rodriguez suggests that the quarterly training is for proficiency, which suggests that

27  the training merely deals with how operate and fire the patrol rifle.  See Rodriguez Depo. 32:18-25.  If that is all that
occurs during recertification, then it would not appear that the failure to receive quarterly training would have been the

28  actual cause of the shooting of Salinas.  There is no evidence that the officers did not properly operate their patrol
rifles.

1    Rodriguez never expressed his personal belief that the shooting was justified, just that the

2    investigating agency found that it was justified.

3          *Plaintiff's Opposition*

4          Plaintiff argues that Chief Rodriguez is personally liable.  Rodriguez allowed the officers

5    to collaborate with their attorney before giving their statements to investigators, which is a gross

6    violation of Policy 310.  His personal participation in the joint meeting amounted to deliberate

7    indifference to constitutional rights and an obstruction of justice.  Moreover, Rodriguez signed off

8    on the officers' use of force against Salinas.  The officers were not disciplined or reprimanded, and

9    they were not required to undergo additional training on either the use of patrol rifles or in dealing

10   with people with mental illness.

11         *Legal Standard*

12         For purposes of 42 U.S.C. § 1983, "supervisory officials are not liable for actions of

13   subordinates on any theory of vicarious liability."  Crowley v. Bannister, 734 F.3d 967, 977 (9th

14   Cir. 2013); Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989).  "A supervisor may be liable

15   only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a

16   sufficient causal connection between the supervisor's wrongful conduct and the constitutional

17   violation."  Crowley, 734 F.3d at 977; Hansen, 885 F.2d at 646.  A sufficient causal connection

18   between a supervisor's conduct and a constitutional violation can be shown by: (1) the supervisor

19   sets in motion a series of acts by others, or knowingly refuses to terminate a series of acts by

20   others, that the supervisor knew or reasonably should know will cause others to inflict a

21   constitutional injury; (2) the supervisor's own culpable action or inaction in the training,

22   supervision, or control of his subordinates; (3) the supervisor's acquiescence in or

23   ratification/condoning of the constitutional deprivation; or (4) conduct by the supervisor that

24   showed a reckless or callous indifference to the rights of others.  See Starr v. Baca, 652 F.3d 1202,

25   1207 (9th Cir. 2011); Dubner v. City & Cnty of San Francisco, 266 F.3d 959, 968-969 (9th Cir.

26   2001); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998); Larez v. City of Los

27   Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

28

1    *Discussion*

2    Plaintiff relies on basically two actions by Chief Rodriguez to impose liability.

3    First, Plaintiff points to Chief Rodriguez allowing all officers to meet together with their

4    attorney before speaking to the FCSD internal affairs investigator, which violated Salinas's rights

5    and obstructed justice.  However, by the time this meeting occurred, Salinas had already been shot

6    and was dead.  This conduct had nothing to do with the use of force against Salinas, and it could

7    not have violated any of Salinas's rights.  Cf. Guyton v. Phillips, 606 F.2d 248, 250 (9th Cir.

8    1979) ("[§ 1983] does not provide a cause of action on behalf of a deceased based upon alleged

9    violation of the deceased's civil rights which occurred after his death.  A 'deceased' is not a

10   'person' for the purposes of [§ 1983] . . . .").

11   Second, Plaintiff contends that Chief Rodriguez "signed off" on the use of force against

12   Salinas and did not require the officers to undergo further training or discipline.  The mere failure

13   to discipline does not show condoning or ratification.  See Clouthier, 591 F.3d at 1253-54.  The

14   uncontroverted evidence is that Rodriguez relied on the conclusions of the Board and the

15   conclusions of the FCSD, which was responsible for two reports.  See Rodriguez Depo. 119:14-

16   123:23.  The three total reports from these entities found that the City officers' use of force against

17   Salinas was justified.  Plaintiff criticizes the substance of the Board's report by pointing to

18   contradictions between the report and the cellphone video.  However, as noted above, there is no

19   indication that the Board reviewed or had access to the cellphone video.  Plaintiff does not identify

20   other aspects of the Board's report or of the FCSD's reports that should have put Chief Rodriguez

21   on notice of constitutional violations and the need for policy changes.  Cf. Henry A. v. Willden,

22   678 F.3d 991, 1004 (9th Cir. 2012) (explaining that per *Starr v. Baca*, 652 F.3d 1202 (9th Cir.

23   2011) allegations that a sheriff had been given clear notice of unconstitutional jail conditions and

24   unconstitutional behavior by deputies was sufficient to show acquiescence in the constitutional

25   violations).  The evidence does not show that Chief Rodriguez condoned or ratified or acquiesced

26   in any unconstitutional acts by the four City officers against Salinas.  See Sheehan, 743 F.3d at

27   1231 ("To show ratification, a plaintiff must prove that the authorized policymakers approved a

28   subordinate's decision and the basis for it."); Henry A., 678 F.3d at 1004.

Neither of the acts relied upon by Plaintiff show a sufficient causal relationship between the shooting of Salinas and Chief Rodriguez's acts. Crowley, 734 F.3d at 977. Therefore, summary judgment in favor of Chief Rodriguez on Plaintiff's § 1983 excessive force claim is appropriate.

## IV.   State Law Claims

### Defendants' Arguments

Defendants argue that the state law claims are related to the Fourth Amendment excessive force claim. For the same reasons that the excessive force claim fails, the state law claims should also fail. Additionally, Defendants argue that a tortious battery is a completed tortious assault. Because the evidence in this case indicates a justified battery, there can be no liability for assault.

### Plaintiff's Opposition

Plaintiff argues that for the same reason summary judgment was inappropriate for the excessive force claim, it is also inappropriate for state law claims. Further, Plaintiff disagrees that he cannot recover for both assault and battery.

### Discussion

There appears to be no dispute that Plaintiff's state law claims mirror her excessive force claim. Because the Court has denied summary judgment on the federal excessive force claim, the Court will also deny summary judgment on the state law claims.

With respect to the assault and battery claims, the Court disagrees with Defendants that Plaintiff cannot recover for assault because the evidence indicates a battery. The torts of assault and battery "are two distinct civil claims with different elements." Warren v. Marcus, 2015 U.S. Dist. LEXIS 10586, *40-*41 (N.D. Cal. Jan. 29, 2015); Davis v. City of San Jose, 2014 U.S. Dist. LEXIS 136015, *18-*19 n.7 (N.D. Cal. Sept. 24, 2014). "A battery is a violation of an individual's interest in freedom from intentional, unlawful, harmful or offensive unconsented contacts with his or her person." Rains v. Superior Ct., 150 Cal.App.3d 933, 938 (1984); see also Judicial Council of Cal., Civil Jury Instructions ("CACI") § 1300 (listing elements of the tort of battery); CACI § 1305 (listing elements of the tort of battery by a policy officer). Battery is

1   "committed if there is unwanted intentional touching of any kind."  Conte v. Girard Orthopedic

2   Surgeons Med. Grp., Inc., 107 Cal.App.4th 1260, 1266 (2003).  An assault is a "demonstration of

3   an unlawful intent by on person to inflict immediate injury on the person of another then present."

4   Lowry v. Standard Oil Co., 63 Cal.App.2d 1, 6-7 (1944); see also CACI § 1301.  "The tort of

5   assault is complete when anticipation of harm occurs."  Kisesky v. Carpenters' Trust for S. Cal.,

6   144 Cal.App.3d 222, 232 (1983).

7        Defendants rely exclusively on *Alejandro v. Williamson*, 2008 U.S. Dist. LEXIS 35417

8   (E.D. Cal. Apr. 30, 2008) to make their argument.  *Alejandro* cited to a California criminal law

9   case and noted that a defendant cannot be convicted of both assault and battery because a battery

10  is a consummated assault.  See Alejandro, 2008 U.S. Dist. LEXIS 354174 at *32.  However, the

11  "intentional torts of assault and battery are defined differently in California civil law cases," than

12  they are defined in California criminal law cases.  Krause v. W. Heritage Ins. Co., 2010 Cal. App.

13  Unpub. LEXIS 6136, *26-*28 n.4 (2010).[18]  The case at bar involves civil claims, not criminal

14  violations.  *Alejandro* has never been cited by any court for the proposition relied upon by

15  Defendants.  The Court is not bound by *Alejandro* and will not follow it on this issue.  Summary

16  judgment on Plaintiff's assault cause of action is inappropriate.

17

18  **V.    Punitive Damages**

19        *Defendants' Arguments*

20        Citing the standards and burden of proof for imposing punitive damages under California

21  and federal law, Defendants argue that there is no evidence that they used force with an evil intent

22  or motive, acted in reckless disregard of Salinas's rights, or acted with malice.  Defendants

23  contend that they did everything in their power to prevent the situation from developing into one

24  in which deadly force had to be used.

25        *Plaintiff's Opposition*

26        Plaintiff argues that a reasonable jury could find that the officers' use of force was

27  ─────────────────

28  [18] Despite state rules, the Court may consider unpublished state cases as persuasive authority.  See Employers Ins. of
Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9t h Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d
1178, 1189 n.4 (E.D. Cal. 2011).

1    excessive and was a reckless or callous indifference to Salinas's rights, or that the officers'

2    conduct constituted a cruel and unjust hardship in disregard to Salinas's rights.  Plaintiff also

3    argues that Chief Rodriguez's participation in the group meeting showed an evil motive.  Further,

4    Chief Rodriguez's ratification of the officers' conduct constitutes a reckless and callous

5    indifference to Salinas's rights.

6        *Discussion*

7        In order to obtain punitive damages under California law, a plaintiff must show by clear

8    and convincing evidence that a defendant acted with malice, fraud, or oppression.  See Cal. Civ.

9    Code § 3294; Roby v. McKesson Corp., 47 Cal.4th 686, 712 (2009).  Plaintiff's opposition did not

10   address punitive damages under California law.  Instead, Plaintiff cited only federal cases and only

11   discussed the federal law standard for punitive damages.  The Court takes Plaintiff's failure to

12   address punitive damages under California law as a concession or abandonment of the claim.  See

13   Estate of Shapiro v. United States, 634 F.3d 1055, 1060 (9th Cir. 2011); Jenkins v. Cnty. of

14   Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); Morales v. City of Delano, 852 F.Supp.2d

15   1253, 1271 (E.D. Cal. 2012); see also Gibson v. Mortgage Elec. Registration Sys., 23 F. Supp. 3d

16   895, 903 & n.18 (W.D. Tenn. 2014); Arnold v. Jewell, 6 F. Supp. 3d 101, 112 (D.D.C. 2013).

17   Therefore, summary judgment will be granted in favor of Defendants on this claim.

18       Punitive damages may be awarded in 42 U.S.C. § 1983 cases if a defendant's conduct is

19   driven by an evil motive or intent, or when it involves a reckless or callous indifference to the

20   constitutional rights of others.  Morgan v. Woessner, 997 F.2d 1244, 1255 (9th Cir. 1993).  A

21   plaintiff must show such conduct by a preponderance of the evidence.  See Dang v. Cross, 422

22   F.3d 800, 807-08 (9th Cir. 2005); see also Smith v. City of Oakland, 538 F.Supp.2d 1217, 1246

23   (N.D. Cal. 2008).  "Conduct is in reckless disregard of the plaintiff's rights if, under the

24   circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the

25   defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under

26   federal law."  Model Civ. Jury Inst. 9th Cir. 5.5 (2014); see Dang, 422 F.3d at 807.  Here, a

27   reasonable jury could view the cellphone video and conclude that the officers acted in reckless

28   disregard of Salinas's Fourth Amendment right to be free from excessive force.  Viewed in the

light most favorable to Plaintiff as the non-moving party, the video does not depict Salinas lunging, charging, sprinting, or running at the officers, it depicts him taking a step out of the elevated planter with his left hand away from his waist.  Summary judgment in favor of Boust, Little, Pulkownik, and Yambupah on this claim is inappropriate.

Finally, as discussed above, there is insufficient evidence to link Chief Rodriguez's conduct with the shooting of Salinas.  Because there is not a viable § 1983 claim against Chief Rodriguez, there can be no punitive damages against him under federal law.  Therefore, summary judgment in favor of Chief Rodriguez on this claim is appropriate.

**CONCLUSION**

Defendants move for summary judgment on all claims against them.

With respect to the Fourth Amendment excessive force claim, the cellphone video reasonably can be viewed as demonstrating that Salinas did not pose an immediate threat to the officers.  Without this threat a reasonable officer would have known that the use of deadly force or the beanbag gun was unconstitutional.  Thus, summary judgment on this claim and on the issue of qualified immunity will be denied.

With respect to the claim for supervisory liability against Chief Rodriguez, Plaintiff's evidence does not indicate ratification or otherwise show a causal connection between the violation of Salinas's right to be free from excessive force and Chief Rodriguez's own actions.  Thus, summary judgment in favor of Chief Rodriguez is appropriate.

With respect to Plaintiff's *Monell* claims against the City, Plaintiff either has not shown a deliberately indifferent policy or that a policy actually caused the violation of Salinas's Fourth Amendment rights.  Thus, summary judgment in favor of the City is appropriate.

With respect to Plaintiff's state law claims, these claims are tied to the Fourth Amendment excessive force claim.  Because summary judgment on the excessive force claim is denied, it is also denied as to the related state law claims.

Finally, with respect to Plaintiff's request for punitive damages, Plaintiff has not defended her request under California law.  Given Plaintiff's failure to defend or address punitive damages

under California law, summary judgment will be granted.  As for punitive damages under federal

law, the cellphone video provides a sufficient basis for a reasonable jury to conclude that the

officers acted in reckless disregard to the rights of Salinas.  Thus, summary judgment on this claim

will be denied.


### ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.     Defendants' motion for summary judgment is GRANTED as to Plaintiff's *Monell* claims,

       Plaintiff's claims against Chief Rodriguez, and Plaintiff's request for punitive damages

       under California law; and

2.     Defendants' motion for summary judgment is otherwise DENIED.


IT IS SO ORDERED.

Dated:   April 2, 2015     _____

                              SENIOR  DISTRICT  JUDGE